It is undisputed that Qwest conferred a benefit on free conferencing by paying switched-access charges for traffic to free conferencing. It is also undisputed that these charges were that Free Conferencing could retain those charges because it provided services to others, not to Qwest, but to its own customers. Under South Dakota law, and as Judge Murphy recognized the last time this case was before this Court, what Free Conferencing did for its own customers is irrelevant. It paid nothing to Qwest, and therefore, when it kept the benefit Qwest gave to it, it was unjustly enriched. We ask the Court to reverse and remand with instructions to enter judgment in Qwest's favor. Now, the District Court's error was in ruling that Free Conferencing, in effect, paid for the benefit that it received by providing conferencing services, again, to its own customers. And under South Dakota law, what matters is that in paying for the benefit, you must pay, of course, the benefactor, the person who confers the benefit upon you. And Free Conferencing didn't pay Qwest for the benefit that it received. It provided those services to its own customers for free. Now, the suggestion that Qwest somehow benefited from these services is unsupported on both the facts and on the law, most importantly because Qwest was not required to pay for any of those services, irrespective of what it received. What it received, it had a right to receive. And what it paid, in the form of a benefit, it had a right to receive. Judge Murphy's analysis on this point is exactly correct, Your Honor. She was the only judge in the prior panel to address the question of Free Conferencing services, and rightly recognized, quoting from her opinion, whether Free Conferencing provided its own customers teleconferencing services is irrelevant. And that was true even if some of its customers were also Qwest customers. Because, quoting to Bill Qwest for any of the calls going to Free Conferencing. Qwest never received any benefit from Free Conferencing's actions, which, in fact, cost it millions of dollars. So the idea that Qwest somehow benefited from these services, again, it's not supported on the facts, and it's not supported on the law. What Qwest received, if anything, it had a right to receive. And it had a right to refuse payment on the switched access charges, which did not comply with the terms of Sancom's tariff. How much... Oh, go ahead. Do we have to... Does there have to be a conclusion that Qwest somehow benefited from this in order to reach the conclusion that the district court did? I mean, I don't think that that's one of the findings, is it? By the district court? It was one of the findings of the district court, Your Honor, that, in effect, Free Conferencing paid for the services, or paid for the benefit received. It earned the services. Right, but to say you earned the services is different than saying who did you earn it from, or who benefited from those services. So, I mean, did Qwest get anything out of this? Your Honor, the facts will show that Qwest, if it received any benefit at all, would have been marginal at best. And in what form, that marginal at best, what form of the benefit did Qwest receive from this, putting aside whether it's an illegal scheme, or an improper scheme, or a proper scheme? Well, certainly the argument raised by Free Conferencing and adopted by the lower court was that Free Conferencing provided services to its own customers, some of whom were also, or may have been, Qwest customers. So those additional services, like 24-hour service calls and some of the other things that made Free Conferencing's service a more quality service, was also benefiting some of Qwest's customers? That was the argument raised below, Your Honor. And does the record support that? The record will show, again, at most, it would have been a marginal benefit that would have been vastly outweighed by the charges that Qwest paid in any event. But there is some of that. There would have been, perhaps, a marginal benefit that flowed to Qwest's customers. And the argument, again, that that somehow indirectly benefited Qwest, not only would it have been vastly outweighed by the charges that Qwest paid, but as a matter of law, and as Judge Murphy recognized, whatever Qwest's customers received is irrelevant here because Qwest had a right to refuse to pay any of the charges at issue. It did not have to pay for any of them. How much of your argument relies on the fact that Qwest had a competing conferencing service that it wanted to provide to its customers? I think it was the Genesys or whatever the competing service. Does that enter into the analysis or enter into Qwest's argument? And if so, how? The Genesys issue is that it's really irrelevant. Genesys was used as a way to gauge the value of the services provided by Free Conferencing. But again, the important point is that those services were provided to others, not to Qwest. Whether or not Qwest received any benefit from this, and again, the record is that the benefit would have been marginal at best, is irrelevant because, as Judge Murphy recognized, Qwest was entitled not to pay for any of those charges. It was entitled to keep anything that it received, however marginal it would have been, and to have refused to issue payment at all. And this is an important point under the South Dakota law, which considers, as unjust enrichment, the difference between what ought to have been received and what, by right, was received. If you look at the Judelstad cases that both parties cited in their brief, for example, the defendant there was unjustly enriched by receiving child support payments in the amount of $241 per month, when by right it should have been receiving $210 per month. The difference between what should have been received and what actually was received was the measure of unjust enrichment. Here, Qwest had a right to refuse to pay any of the switched access charges that free conferencing ultimately received. Therefore, free conferencing had no right to receive those charges, and its retention of those charges is unjust enrichment. Now, why do you say, why do you say, one thing that you leave out here, in your answer you just gave, in your description, is SANCOM. Now, it's my understanding that Qwest paid nothing directly to free conferencing. That's exactly right, Your Honor, and the, I, I, I. So isn't that an important consideration here? Well, the, the consideration is this. I asked the court to look closely at the SANCOM free conferencing contract. Free conferencing was entitled to receive, receive a share of the charges that SANCOM received, but if SANCOM did not receive the charges, then neither did free conferencing. So if SANCOM had no right to receive those charges, then under the terms of its contract, neither did free conferencing. Free conferencing's right to receive those charges is contingent upon SANCOM's right to receive those charges. And for that reason, the district court correctly held that Qwest did in fact confer a benefit on free conferencing, a point that's not disputed here. Now, the other thing I wanted to ask you about, and if you, if you read our, some of our opinions with respect to this relationship, which has spawned a good bit of litigation and previous appeals to our court. You know, I've, I have highlighted the activities of SANCOM. And SANCOM's record as the entity that you could say put this, put these deals together and solicited the participation of free conferencing. And so with that background, and we're talking about unjust enrichment here, and the issue of whether it's inequitable to allow free conferencing to retain the benefits that it accrued here. What about the services that free conferencing supplied? Isn't it true that in this arrangement, free conferencing, in order to make this operation, this three-sided operation work, that it had to provide services including customer support, access to its website, the conference call services themselves, the 24-hour customer support, as I said. So what's it, what's equitable about requiring it to, to disgorge monies that it received when it actually provided services? Again, Your Honor, as Judge Murphy recognized, what free conferencing provides to others, not to Quest, is not relevant because Quest was entitled to keep the charges that were assessed. Now, I hear in Your Honor's question, the question of is free conferencing provided these services? They labored, they worked. Why aren't they entitled to something? And I direct the court to the Johnson opinion that we cite in our brief. And note the stature of the defendant in that case, an individual by the name of Penny. In order to haul away the rock from the property of Larson, there were some 25 to 50 semi-truck loads of rock that had to be freighted away. And the court, in determining whether or not Penny was unjustly enriched and in what amount, correctly acknowledged that the value of the benefit unjustly received, rather than the value of the service provided, is the correct measure of unjust enrichment. In other words, what matters is that the rock belonged to Johnson. Whatever effort Penny engaged in to haul away what, by right, belonged to Johnson is immaterial. The fact of the matter is, it was Johnson's rock. And these- But here's the thing, and this gets back to the first of Judge Shepard's two questions. This is not a three-way deal. This is actually a four-way deal. Because you have Quest, you have SanCom, and you have free conferencing. And then you have free conferencing users. Free conferencing's end users also got a benefit here. They got- Arguably, they were unjustly enriched because- And that's why I asked you the Genesis question. Because for Genesis, they would have had to pay, potentially, for conferencing, or maybe from another conferencing service. And here, they got free conferencing. So why can't, under an unjust enrichment theory, why doesn't it go all the way to the end users, not just free conferencing? Well, there's actually another point with the Genesis issue that matters here. And the fact is, with the calls to Genesis, Genesis complied with tariff calls. The charges in those cases were legitimate, which is one of the reasons free conferencing was able to offer its services less. It wasn't paying the tariff charges. It wasn't paying for its expenses. But another point, as you say, whether you consider this a three-way deal, a four-way deal, Quest's participation in this deal was involuntary and non-consensual. It wanted nothing to do with this. And as soon as it discovered the facts kept confidential by free conferencing and SanCom, showing that these charges were, in fact, illegitimate, it refused to pay any longer, as all courts who have considered the issue, including this court, have recognized it had a right to do. So under your theory, just taken to its logical extension, why is this labeled Quest versus free conferencing? Why isn't this Quest versus each of the individual end users who benefited from this arrangement as well? They were unjustly enriched as well. The users of free conferencing. Understood. Certainly trying to bring litigation against each of the end users would be unwieldy. Candidly, we haven't considered whether or not we would want to bring that many claims. The fact of the matter is, however, free conferencing received a benefit from Quest. That charge belongs to Quest. It should never have been paid, and we want it back. I agree with you, but I guess my question is, is why isn't there some problem with your theory when it would allow you to go after the end users? To me, just as sort of a conceptual matter, it troubles me that under your unjust enrichment theory, theoretically, you could go against the end users, which makes it very attenuated. And so I wonder whether the lack of a relationship between free conferencing and Quest directly also creates the same problems I'm seeing with the end users. Well, at the very least, SanCom's contract with free conferencing is important. Free conferencing was the first to approach SanCom. Free conferencing drafted the contract that signed with SanCom. David Erickson, the free conferencing's president, described himself as a pioneer of this industry. Certainly, free conferencing's involvement is much more extensive than free conferencing would have you believe. And that is one among many factors that might distinguish a claim against free conferencing versus a claim against its customers. Thank you. All right, Ms. Coppola. May it please the court, counsel. Thank you, your honors. To build on the justice's last point, the theory that if we were to apply just enrichment here would permit a theory of unjust enrichment against the regulatory consultants that help put together the deal as well. And I think that's an important issue to remember. I just wanted to mention that because of your last question. No, it is. The one contrary point is I think that one thing you have here, and I was going to ask you about this, is that free conferencing had knowledge of the benefit and knowledge of the deal. I don't know that the end users did. I think that taken to its logical extension, the end users, if they had knowledge, you could go after them, but I'm not sure many of them did. That may be right, your honor, but certainly Vantage Point, the consultant that put together the deal, and Mr. Rowhead, who also worked for Sancom, who put together the deal, had knowledge and involvement in putting together that deal. So I think that could be an extension of the unjust enrichment claim, could be certainly to those individuals. But to get back to what I think the inquiry should be today for this court is did the district court abuse its discretion when it found that it would not be unjust to permit free conferencing to keep the marketing fees paid to it under its contract? Quest has made no showing of an abuse of discretion. Now the district court examined the issue of Quest's unjust enrichment claim three times in the lower court proceeding. After a 60 bench trial, after a motion to vacate the judgment, and upon reband by this court. And each time, the court found that the benefit was not unjust, because when a recipient of a benefit reciprocates with consideration, the enrichment was not unjust. So far, the discussion here this morning has been on looking at what Quest paid. But the inquiry comes from the other side. Would it be unjust for free conferencing to retain that benefit? And the court found that because of the services provided, which the court mentioned, it provided the connection of the conference calls on the bridges, the network monitoring, record keeping, web access, 24 hour customer service. All of the services that are outlined in the brief and supported by the records. These were valuable services that were provided to SANCOM as well as Quest. Let's remember here, when a call is placed, the telephone calls at issue, the calls are placed by a Quest long distance customer. A Quest customer. So how many, so they've talked about just a marginal sort of benefit that Quest would receive based on what free conferencing had agreed to do with SANCOM. Do you agree with that assessment? Well, no, your honor, I don't. Because, so they talked about the benefit. So, from what I understood the answer to be from counsel. Quest, in Quest's opinion, would only receive a minimum monetary benefit, is what they were saying. Because of the amount that was paid to SANCOM to connect the calls, versus the amount Quest received from its customers in placing the calls. But here, we have to remember that every call that was placed was placed by a Quest customer seeking to connect a call. So the call was connected to a conferencing bridge. And so, SANCOM received the services that it bargained for, as did Quest. But I think the important point also is that the court looked at the rate that was paid. So, free conferencing provided services, and we've gone over what those services are. The court then looked at, was it unjust amount that was received by free conferencing? It looked to the Genesis contract as a marketplace value, right? What's the value of that services it should have received? Quest paid another company, Genesis, between two and four cents a minute for far less services. Just providing a conferencing bridge. So the Genesis contract, as well as evidence in the record about an AT&T commercial agreement and a Verizon commercial agreement. Those are touchstones to say the services that were rendered were fairly paid for at a fair rate in the market. Let me simplify this. Look, this is an incredibly complicated transaction. We had to draw a picture to figure out what was going on here and who was involved. But let's simplify it. And what I'm worried about is that the district court's decision may have been a little over broad. So to simplify it, suppose we have a bank robber, and I'm not comparing free conferencing to a bank robber. But there is, at least from the FCC decision, some wrongfulness to this. They ultimately concluded this was not kosher. But let's suppose we have a bank robber, and the bank robber pays for the gun. So there's a benefit that's received. And the bank looks and uses the bank's proceeds to get the gun. And the bank comes back and says, I want the money back. You were unjustly enriched because you sold the gun. That's very different than the bank robber going out and buying groceries and trying to disgorge the grocery store. And so what I'm concerned about is that the district court's reasoning is so broad. Because there's a service here that it would allow the bank not to be able to disgorge the person who sold the gun that led to more bank robberies. And so I'm trying to figure out how we can cabin what the district court did here so that just providing services doesn't lead to being insulated from an unjust enrichment theory. Thank you for the question. I actually think in your scenario, your honor, the bank robber here is more like Sancom. This is not a two way interaction. We have Sancom sitting in the middle. And Sancom, under the FCC's rulings, is the one that did not comply with its regulatory obligations. I agree, but free conferencing, in the analogy, may have been the folks who sold the bank robber the gun, and that's my concern. And so the concern you're asking about, your honor, is if the gun seller was unjustly enriched because of. But in your scenario, I think, your honor, the gun owner did not provide the bank robber a service here. They provided the gun. Well, and so. That's, I mean, I'm trying to simplify. Maybe I'm making it more complicated. I may very well, but I'm trying to get at this. I'm sorry to interrupt, your honor. I think the best way to look at the relationships is using the Parker case. And I diagrammed this out as well. So in the Parker case, we have the insurance company. It had a contract with an individual named Parker. And Parker would get money from the insurance agency, commissions, and then Parker would sell insurance. That was the contract. That contract was breached because the insurance agency then sold this company to the purchaser. Here in my analogy, free conferencing would be the purchaser, right? Insurance agency is SanCom, Parker is Quest, purchaser is free conferencing. Now the purchaser paid money to that insurance agency. But that transaction, in effect, made the insurance company breach its contract with Parker. And in that scenario, the court found there was no unjust enrichment because the purchaser, here free conferencing, provided consideration to that insurance agency. And so even though there was that breach between the insurance agency and Parker, there was no unjust enrichment because there was consideration on the other side of the transaction. Well, and I guess, not to help you, but one of the things that I guess your answer reveals to me is there's a little difference here between the bank robber scenario. Because here you have end users who had no idea about it. You are providing a service to yet a fourth party, which is not in my hypothetical, that makes that a little different than the bank robber scenario. Thank you, and I would agree with that. There are a variety of services and work that was being conducted by free conferencing to a number of parties. And we have to separate that transaction out from the illegality or regulatory in compliance that was conducted by SanCom and Quest. We have to consider that secondary relationship between SanCom and free conferencing. The consideration that was provided in that transaction makes it not inequitable for free conferencing to maintain the benefit it received. That no one disputes that the benefit came from Quest, right? That Quest bestowed the benefit, right? The first two steps of the unjust enrichment analysis are not at issue? I believe that is what the district court had found in its remand opinion. I would say that our position has been that it's still too attenuated. The flow of money was too attenuated here. But you are correct, Your Honor, that at the district court level, the court found that the first two elements were satisfied. Because it does seem like in the discussion of where the money is coming from, who benefits, who quote unquote earned it in services, we're leaving out SanCom. And I'm just struggling with how SanCom is the third party to all of this. And maybe the money improperly came from SanCom. Well then it would be SanCom's claim then, Your Honor. Well I understand that, I understand that. But I wonder if that's part of why this is really kind of hard to talk about, because of the disconnect between Quest and FC. So we're talking as if we're with the load of rock kind of case. But I'm still struggling with, even if FC provided these services that we've discussed here, and I understand it's what was unjustly received. But still you've got some party out there that presumably received some kind of recipient benefit from it. And it's, when we're talking about Quest, that's why I've been sort of trying to get at, what did Quest get out of this? Quest got its calls connected. Quest's customers were able to connect to the conference calls they were trying to reach. But Quest then had to pay SanCom to get those connected. That would be correct, and under what the FCC found, the manner in which those charges were assessed by SanCom were found to be improper. But that does not mean that the services that free conferencing provided were not compensable, were not improperly provided, that the benefit would not be unjust. Because there was no finding of illegality or wrongdoing by free conferencing from the regulatory standpoint. Or any standpoint, really, in this case. Does that matter? Yeah, it does. It does. So the district court said, this court remanded to the district court, because it said the district court improperly looked at free conferencing's intent. And the court needed a remand to ensure that the factors weren't improperly weighed. And so removing the intent factor... So it does matter. The intent matter does factor. But its role in procuring, I think, the breach would. And so, putting all of those issues aside, the district court found, in reviewing all of the evidence, that there was sufficient evidence of a benefit that was not inequitably received. Well, the only party throughout the history of this, in thinking about these various entities, the only party that violated a contractual agreement was SANCOM. That's right. That's correct, Your Honor. No determination has been made by any court that free conferencing did anything illegal, or that it violated any contractual agreement. That's correct, Your Honor. And moreover, it performed under its contractual relationship with SANCOM. It provided the services it negotiated to provide. There was consideration exchanged, and it provided those services. And so the only wrongdoing was by a regulated entity that is a carrier under the act, and has regulatory obligations to charge other carriers in a certain way. There was no finding, by anything, of free conferencing's wrongdoing in that respect. It's very simple. This is why I go back to this matter of equity. This is an equitable remedy. And it seems to me that Quest has its legal remedies against SANCOM. And here, it just concerns me that you have an entity such as free conferencing, found by no one to have done anything illegal, nor to have violated any contract, and has provided services that it would be determined to be inequitable, that their status would be disturbed. That's precisely the point, Your Honor. There was services provided. It would be inequitable. It is not inequitable for free conferencing to maintain what it was paid. There was no finding of wrongdoing by the FCC, or by the district court, and as affirmed by this court, on any of the other counts. And so if the court has no further questions, I'll ask it to affirm the judgment of the lower court. Thank you very much. Counsel, I wanted to follow up where Judge Shepard left, which is equity, it's discretionary, it's abuse of discretion. It's not a legal remedy. And so we have to accord the district court a whole lot of room here. And so does that make this case different? I mean, we really have to give them a lot of leeway. It isn't different, Your Honor. And it's no different than it was last time the court remanded to the lower court, because it considered an irrelevant factor. And what Judge Murphy identified as an irrelevant factor, services provided to others. Now, I have two points I want to address on rebuttal. The first goes to your questions to me, Judge Strass, of whether or not Quest could bring claims against other parties. The answer to that question is no, because Quest didn't confer a benefit upon those end users, those other customers. It conferred a benefit on SanCom and free conferencing, in the form of the switched access charges that SanCom split with free conferencing. That's where the money flow stops. It doesn't go beyond those parties. Those are the ones that receive the charges. The second point I wanted to address was Judge Shepard's- Quest received a benefit. Excuse me? Quest received its benefit of its bargain, right? Otherwise it wouldn't have entered into this contractual relationship with SanCom that's governed by the federal tariff. The answer is no, it did not, because it did not receive switched access service. It did not receive the benefit of its bargain. It's entitled to pay zero for it as a result. But the other question I want to address- Excuse me? So you're saying it received no services? None for which charges could be assessed under the tariff and filed rate doctrine, as this court has recognized. But it entered into its agreement with SanCom and not an agreement with free conferencing.  SanCom filed a tariff. But the last point I would like to address, please, if I may, Your Honor. Your question about services provide, or whether free conferencing breached any legal agreement, breached a contract. Neither did Penny, the defendant in Johnson, breach any contract. It had no contract with Johnson. If there were a contract, Johnson could have brought a breach of contract claim. Instead, it brought an unjust enrichment claim, because Penny, whether intending to or not, took property that belongs to Johnson and retained it. So too has free conferencing retained a benefit that Quest paid to it, and we're asking for it to be returned. Thank you. All right, thank you, counsel. Thank you for your arguments. Case is well argued. It's submitted. We'll render a decision in due course. Does that conclude our calendar for this morning? It does, Your Honor.